Pee Curiam:
This case was referred to Trial Commissioner George Willi with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on October 15,19Yl. Exceptions to the commissioner’s opinion, findings of fact and recommended conclusion of law were filed by plaintiff, defendant urged that the court adopt the commissioner’s report and the case has been submitted to the court on oral argument of counsel and the briefs of the parties.
Since the court agrees with the commissioner’s opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover and the petition is dismissed.
OPINION OP COMMISSIONER
Willi, Commissiooier: Plaintiff challenges the validity of his dismissal from employment as a purser with the Military Sea Transportation Service (MSTS) of the United States Navy. He was a preference eligible with more than 20 years of government service at the time of his removal. He represented himself at the administrative level, electing to contest the charges against him by written submissions in his own behalf and to appeal the adverse decisions on those charges through MSTS channels and ultimately to the Secretary of the Navy, rather than to the Civil Service Commission.
Having exhausted his administrative remedies, plaintiff asks this court to make its own assessment of the documentary *859 record compiled in the administrative proceedings and to upset Ms removal on one or more of four grounds: viz, that he was actually discharged for a reason other than those assigned in the charges formally preferred against him; that he was denied the opportunity of making an intelligent election as between his rights of administrative appeal through military channels, on the one hand, and to the Civil Service Commission on the other; that removal was too harsh a sanction for commission of the acts with which he was charged; and, finally, that when the MSTS Commander set aside one of the charges preferred against plaintiff, he was legally obliged to remand the entire matter to the subordinate MSTS reviewing authority for reconsideration of its earlier denial of the appeal.
Though both parties were content to limit the evidentiary record in this court to that made at the administrative level, they disagreed as to the standard by which factual conclusions are to be drawn from that record, plaintiff contending for application of the preponderance standard typically associated with a de novo proceeding and the defendant insisting on the substantial evidence criterion by which trial-forum factual determinations are customarily tested on appellate review. As applied to the particular circumstances and issues presented in this case, the court ordered that the preponderance standard be applied to the factual aspects of the questions dealing with sufficiency of the charges and election of administrative appeal forum, while substantial evidence was to apply in the adjudication of the remaining issues. The detailed findings of fact accompanying tlfis opinion have been made in accordance with that directive. They are summarized herein to the extent necessary to an understanding of the questions presented and the determinations made thereon.
The events that culminated in the formal charges on which plaintiff was ultimately dismissed in 1964 followed closely in the wake of an earlier disciplinary scrape in which the punishment imposed was tempered because of his relatively[1] *860 good prior record. In presenting Ms case here plaintiff understandably tends to largely overlook this background wMch, it fairly appears from the record as a whole, was quite germane to the preferral of the removal charges to wMch he takes exception.
In April 1963, plaintiff was notified that MSTS was considering disciplinary action against Mm for being drunk on duty aboard the USNS McGRAW while the ship was in port at New York on March 27,1963. He was given an opportuMty to answer that charge personally or in writing. He did so in writing; admitting that he was intoxicated but denying that he was incapacitated and characterizing the McGRAW’s captain, who had made Mm undergo a blood alcohol test that showed him to have been “strongly under the influence of alcohol,” as a “master moron,” “johnny-come-lately,” “tyrant and bum,” and a “moron.” (Finding 3, infra.)
On May 8,1963, plaintiff was served with three charges, i.e., the state of drunkenness referred to above, the scandalous references to the McGRAW’s captain in responding to the drunkenness charge and, finally, a charge of failure to report for assignment as an assistant purser on April 24,1963 and continuous unauthorized absence thereafter until May 8, when the charges were served. Again, plaintiff elected to re-» spond in writing. As to the first charge, he acknowledged that he was “under the influence” but insisted that he was capable of woriring. He admitted the two other charges (finding 4, infra).
On June 6, 1963, on the above charges and plaintiff’s response thereto, he was given a 30-day suspension, effective the prior May 13, and admonished that “Any further offenses on your part in the next two years may result in more severe disciplinary action.” (Finding 5, infra.)
MSTS regulations defining a reckoning period specify that: “Once an offense has 'been committed for which penalty action has been taken, the employee is liable for two years after the offense to heavier penalties for subsequent offenses, regardless of the nature of such offenses.” (Finding 6, infra.)
On June 12, 1963, Commander J. A. Mercadante of the MSTS Atlantic headquarters at New York, discussed with *861 plaintiff bis past disciplinary problems and possibilities of future assignment. The commander told plaintiff that only his clean official record had gained him a 30-day suspension, rather than dismissal, for the drunkenness, insubordination and AWOL charges that had been placed against him. The commander specifically admonished plaintiff that “Any further infraction of regulations would leave him, wide open for dismissal.” (Finding 7, infra.) On the subject of a new duty assignment, it appeared that no MSTS ships were scheduled to be in New York until late in June. Commander Merca-dante accordingly offered to assign plaintiff to the MSTS Receiving Station ashore in the meantime so that he could be in a pay status while awaiting sea duty. He declined the offer, however, preferring to remain on leave-without-pay until he received a ship assignment.
On June 28, 1963, plaintiff again met with Commander Mercadante and accepted the latter’s offer of assignment as purser aboard the USNS ELTANIN, a passenger-carrying ship held in special esteem by upper echelons of the MSTS Command. Because of plaintiff’s recent disciplinary difficulties and the special requirements for exemplary behavior aboard a ship like the ELTANIN, Commander Mercadante specifically emphasized the absolute necessity of good conduct on the assignment. Plaintiff responded with the assurance that “You will have no trouble with me.” (Finding 7, infra.) The uncontradicted evidence shows that, however well-intended, that assurance was to be soon belied.
Plaintiff reported for duty as purser on the ELTANIN in New York harbor on July 6,1963. Shortly after boarding he was introduced to the ship’s master, Captain G. W. Fladerer. The captain’s initial impression of plaintiff was understandably adverse when he observed him to be inebriated (findings 8,12, infra).
On July 24,1963, while the ELTANIN was in port at Valparaiso, Chile, plaintiff went AWOL for 8 hours. Upon learning of this, Captain Fladerer’s initial reaction was to cable MSTS headquarters requesting plaintiff’s replacement and recall to the United States. Plaintiff was aware of this dispatch and prevailed upon the captain to rescind it in favor of *862 issuing him a formal letter of reprimand that was to, in effect, place him on probation for the future. The letter of reprimand was delivered to plaintiff on July 27,1968 (findings 9, 10,12, mfra).
MSTS regulations define a purser’s duties to include (1) the maintenance of a Time and Attendance record on each crew member, (2) the posting of all disciplinary actions taken at sea on the Employment Record Card of each crew member involved, and (3) the transmittal to the MSTS Industrial Relations Office at the conclusion of every voyage of a copy of the record of each disciplinary action taken during the course of that voyage. Plaintiff made no entry on his Employment Record Card or transmittal to the Industrial Relations Office respecting the July 27 letter of reprimand until the following November when an inspection by Captain Fladerer disclosed this delinquency (finding 10, infra). At the same time the captain discovered that plaintiff’s Time and Attendance Card erroneously showed him as having been on duty July 24r, 1963, the day that he was AWOL (finding 11, mfra).
In October 1963, Captain Eladerer requested MSTS to relieve plaintiff of his duties aboard the ELTANIN and recall him to the United States. The captain’s reasons for this action appear in a Special Voyage Report of November 1963. In sum, the captain reported that plaintiff invariably drank excessively in port, consistently maintained a slovenly personal appearance and was prone to unreasonable procrastination and sloppiness in the performance of his assigned work (finding 12, infra). Captain Eladerer attached to his report a copy of a November 10,1963 report by the ELTANIN’s doctor, concluding that although plaintiff had an above-average intellect he had emotional problems that left him in chronic despair to which he reacted by consuming large quantities of alcohol. The doctor recommended psychiatric examination and treatment for plaintiff (finding 13, infra).
The ship’s storekeeper aboard the ELTANIN surreptitiously gave plaintiff a copy of Captain Fladerer’s remarks concerning him, as set forth in the Special Voyage Report previously mentioned.' On December 5, 1963, plaintiff wrote Commander Mercadante a long letter acknowledging his *863 awareness of the voyage report. The letter was replete with scurrilous references to Captain Fladerer and various other masters and first officers under whom he had sailed (finding 14, infra).
On December 12,1963, while the ELTANIN was in port at Valparaiso, Chile, plaintiff was replaced as ship’s purser and recalled to the United States pursuant to Captain Fladerer’s request of the prior October (finding 15, infra). Instead of returning to the United States at that time, however, plaintiff decided to remain in South America for a vacation. Since he did this without prior notice or approval, his whereabouts were unknown to MSTS (finding 39, infra).
It was not until February 10,1964 that MSTS was able to reach plaintiff, then residing at a Y.M.C.A. in Brooklyn, to notify him to report forthwith to the MSTS Crewing and Receiving Branch in New York in order that a physical examination could be scheduled for either February 11 or 13. The scheduling of an examination for plaintiff was prompted by the ship doctor’s report and recommendation of the prior November, mentioned above. As of February 14, 1964, he had neither reported as directed nor explained his failure to do so (finding 16, infra).
On March 13, 1964, plaintiff was informally interviewed by two members of the MSTS Industrial Relations Office for the purpose of determining whether formal charges should be preferred against him. When asked why he had falsified his Time and Attendance Card for July 24,1963, the day that he was AWOL, he said simply that he had made an error. He gave generally similar type explanations for not having noted the fact of Captain Fladerer’s letter of reprimand on his Employment Record Card and failing to send a copy of that letter to the Industrial Relations Office. His justification for the defamatory letter to Commander Mercadante was that of trying to defend himself in respect to the unfavorable allegations concerning him in Captain Fladerer’s voyage report. After questioning plaintiff on the foregoing subjects, the Industrial Relations representatives advised him that he might also be charged with a failure to obey orders for not responding to the directive to report for the planned medical *864 examination. In sum, the Industrial Relations people concluded that plaintiff’s exculpatory explanations in response to the matters about which they interrogated him were not satisfactory and that, accordingly, his MSTS employment should be terminated (finding 17, infra).
On March 17, 1964, plaintiff was served with a notice of proposed removal based on four charges preferred by the MSTS Industrial Relations Officer. The charges were: (1) conduct unbecoming a government employee in the form of derogatory remarks about various MSTS captains and other personnel; (2) failure to comply with Ship’s Order #2 by improperly showing himself on duty July 24,1963 on his Time and Attendance Card for that date when, in fact, he was AWOL; (3) failure to comply with Ship’s Order #2 by failing to post the July 27,1963 letter of reprimand on his Employment Record Card and failing to forward a copy of that disciplinary action to the Industrial Relations Office; and (4) unauthorized absence for failure to comply with the placement officer’s February 10 directive to report to the Crewing and Receiving Branch by or before February 13, 1964. The notice also listed prior offenses consisting of: under the influence of intoxicants during working hours on March 27, 1963; derogatory statements made April 5, 1963 about the captain of the USNS McGRAW; failure to report for a duty assignment on April 24, 1963; and unauthorized absence on July 24,1963. Finally, the notice advised plaintiff of his hearing rights as a preference eligible (finding 18, infra).
Plaintiff elected to respond in writing to the charges against him. He did so in a 12-page handwritten submission that was generally similar in substance to the positions he advanced orally before the Industrial Relations people (finding 21, infra).
In a decision[2] of April 9,1964, the MSTS Commander for the Atlantic Area found that the evidence sustained each of the four charges preferred against plaintiff and advised him that he was to be removed April 20,1964, subject to his right of appeal. The decision included a detailed explanation *865 of the appeal avenues available to plaintiff and the procedures for utilizing the same. By that explanation plaintiff was told that he could appeal at that point to either the overall Commander of the MSTS or to the Civil Service Commission ; that if he chose the Civil Service route, he forfeited the right of any further appeal through Navy channels; that if he appealed to the MSTS Commander and was still dissatisfied, he could appeal that decision to either the Secretary of the Navy or the Civil Service Commission, but not both. While that particular document made no express reference to the availability of evidentiary hearings on appeal, the MSTS regulations with which plaintiff’s job as a purser required him to be familiar[3] expressly provided [4] that no hearing would be afforded on an appeal through MSTS and Navy channels and that, conversely, an appeal to the Civil Service Commission would entitle him to a hearing.[5]
By a series of writings dated April 19, 27, and 30, 1964, plaintiff appealed his dismissal to the MSTS Commander (findings 26-28, infra).
Plaintiff was furnished a copy of a May 7,1964 memorandum by which the MSTS Atlantic Area Commander forwarded the entire removal proceeding file to the Commander of the MSTS with the recommendation that plaintiff’s appeal be denied (finding 29, infra). Upon receiving his copy of the Atlantic Area Commander’s transmittal memorandum, plaintiff wrote both to him and to the MSTS Commander (finding 30, infra).
Finally, on May 14,1964, plaintiff wrote the MSTS Commander at Washington, D.C., a 3-page letter that he characterized as “MY BEAL APPEAL” (finding 32, infra). In this submission plaintiff recapitulated the three charges that culminated in his 30-day suspension in May, 1963, as well as the four currently pending against him and stated his position as to each (finding 32, mfra).
As to the first of the 1963 charges, being intoxicated while on duty aboard the MoGBAW, plaintiff commented: *866 “Proved. But I was capable of working.” On the charge of conduct unbecoming a government employee,, based on his defamatory references to the McGRAW’s captain in his written response to the intoxication charge, plaintiff’s rebuttal was: “Proved. But of a compotmded nature.” Regarding the last of the 1963 charges, failure to report on April 24 for a duty assignment and subsequent unauthorized absence, plaintiff’s exculpatory explanation was: “Not proved. I had asked for LWOP in good time.”
As to the first of the four current charges, conduct unbecoming a government employee, based on plaintiff’s December 5 communication to Commander Mereadante, his defense was: “Illegal and unfair. Memo was informal and personal. Intention in sending memo is of paramount importance. How does this stand up from a legal standpoint? (Remember, memo wouldn’t even exist except that I was given a copy of Master’s Special Report by the Yoeman-Stkpr) I think I had proved in my dispatch that both the ship and LANT were out of order in taking me off the ship. If the ship had been in New York or close vicinity, then the captain’s report could have been checked at first hand. But thousands of miles from home base, and where one was supposed to stay on the ship unless removed in an emergency situation. The captain’s report and the doctor’s were merely opinions. LANT erred, in my opinion, in not verifying the charges, by either asking for charges against me (of which there were none), or making a telephone call to ascertain whether a concrete foundation for the relief was justified. In this LANT backed the Master, which I considered in the nature of quasi-military censorship.”
As to the two charges of violation of Ship’s Order #2, one for falsifying his Time and Attendance Card for July 24, 1963 to show him on duty that day when in fact he was AWOL and the other for failure to record the reprimand letter that he received for being AWOL on his Employment Record Card and failure to forward a copy of that disciplinary action to the Industrial Relations Office, plaintiff simply asserted: “Both of these charges are unproven, are therefore of no merit, are invalid, in fact and out of order. They should *867 not exist because it is impossible to prove that I am guilty of these two charges.” Apart from the fact that there was never any question but that plaintiff’s time card bore a false entry for July 2d, 1963, his final rationalization of the charge pertaining to that inaccuracy becomes the more difficult to comprehend when it is noted that only 4 days earlier he had written the MSTS Commander admitting that when he made the entry in question he realized it was false (finding 30, infra).
Finally, as to the charge based on failure to report to the Crewing and Receiving Branch, as ordered, in February 1964, plaintiff said: “This charge I consider completely out of order, and within the province of procedural error.”
On June 15,1964, the MSTS Commander issued his decision on plaintiff’s appeal. He set aside the charge of conduct unbecoming a government employee as procedurally defective and, on the finding of ample evidentiary support in the record, affirmed the charges based on violation of Ship’s Order #2 and unauthorized absence for failure to report to the Crewing and Receiving Branch. In conclusion, the decision apprised plaintiff of his alternative and mutually exclusive rights of appeal to the Secretary of the Navy or the Civil Service Commission (finding 33, infra).
The procedural infirmity perceived by the MSTS Commander with respect to the unbecoming conduct charge was that MSTS regulations prohibited use of that charge when the offense involved was covered by a specific Ship’s Order. In this instance, Ship’s Order #35 plainly covered the types of remarks made by plaintiff about various MSTS masters and other officers in his letter of December 5, 1963 to Commander Mercadante (finding 34, infra).
On July 8, 1964, plaintiff forwarded a 10-page handwritten appeal to the Secretary of the Navy (finding 35, infra). The document was devoted for the most part to a recitation of argumentative generalities. Nowhere in it did plaintiff advance any exculpatory explanation of the charge based on falsification of his Time and Attendance Card for July 24, 1963, the date that he was AWOL. As to the other charged violation of Ship’s Order #2, plaintiff contended that he *868 should be acquitted because it could not be proved that he would not, if left to his own devices, have eventually noted Captain Fladerer’s July 1963 reprimand letter on his Employment Record Card even though he had not done so by November of that year when the omission was discovered by the captain. Similarly, he insisted that the mere fact that MSTS Atlantic headquarters had not received a copy of the reprimand letter from him was not adequate proof that he had not mailed a copy to that headquarters as required by the regulations.
On July 31,1964, after plaintiff had sent the Secretary a 2-page supplement[6] to his appeal, the MSTS Atlantic Area Commander forwarded the case file and plaintiff’s personnel file to the Secretary under cover of a transmittal letter, a copy of which was routed to plaintiff, recommending that the appeal be denied (finding 37, infra).
On August 3, 1964, plaintiff addressed a 5-page “final appeal” to the Navy Secretary, with a copy to the MSTS Atlantic Commander. In content this submission was primarily repetitive of his original appeal to the Secretary, previously described. The only new matter in it was the contention that 'he should not be removed in any event because MSTS had waited too long in preferring charges against him, i.e., from December 12, 1963, when he was removed from the ELTANIN in Valparaiso, until March 13, 1964, when he was interviewed by Industrial Relations representatives concerning the impending preferral of charges (findings 17 and 38, infra). When the Atlantic Area Commander received his copy of this communication he wrote the Secretary a 1-page 'letter advising that plaintiff had decided on his own to remain in South America on an extended vacation after his removal from the ELTANIN (finding 39, infra).
In a letter of September 22,1964, the Secretary rendered his final decision on the appeal (finding 40, infra). Speaking of the charges relating to the July 1963 AWOL incident, the Secretary said:
2. * * * There is no question based on the evidence that, as of November 1963, you had made no correction to *869 the time and attendance report for 16-31 July 1963 to reflect that you were not in a duty status on 24 July, nor had you entered on your Employment Becord Card the letter of reprimand dated 26 July which was issued for unauthorized absence on 24 July. Accordingly, each of these charges is sustained, and the fact that you acknowledged your absence on 24 July, in a letter dated after the Ship’s Master discovered the infractions, cannot serve to mitigate the seriousness of the offenses.
;{í # Hs Jfe #
4. In view of the above, and in consideration of your past record as cited in the advance notice of proposed removal and restated in the final decision, it is concluded that the charges are sustained and the penalty of removal was appropriate. Accordingly, your appeal is denied.
* * ❖ $ *
h. This decision exhausts your rights of appeal from your removal.
When evaluated in the context of the factual setting outlined above, and more fully detailed in the accompanying numbered findings, none of the four separate contentions relied on by plaintiff to invalidate his removal can be sustained.
Plaintiff’s first and seemingly foremost assertion is that the formal notice of charges issued him on March 17, 1964[7] was defective as lacking both all the reasons and the true reasons for which MSTS sought to dismiss him.
Section 14 of the Veterans’ Preference Act, 5 U.S.C. § 863 (1964) (currently 5 U.S.C. § 7512(b)), requires that, in the case of a veteran such as plaintiff, the notice must state “any and all reasons, specifically and in detail, for the proposed action.”
The above provision originated in substance as the' so-called Lloyd-LaFollette Act, which was adopted as Section 6 of the Post Office Appropriation Bill, H.E. 21279, 62nd Cong., 2d Sess., ch. 389, 37 Stat. 539, 555. Although in the form that the bill passed the House, and as it was reported by the Senate Committee,[8] the legislation covered only postal *870 employees, its scope was broadened by a Senate floor amendment[9] to encompass the entire classified civil service.
The purpose of the requirement for advance notice to the employee of the charges against which he would have to defend was made very plain in the course of the legislative deliberations. Thus, a principal proponent of the measure in the House explained its aim as follows (48 Cong. Rec., Part 5, p. 4656 (April 12, 1912)):
The legislation recommended in this bill will insure to all the civil-service employees in the postal service the right to be furnished with a written copy of charges preferred against them, and will allow the employees a reasonable time to answer said charges in writing and to submit affidavits in support of their defense. * * * This will give assurance and confidence to the employees that they will at least get a square deal, and will not permit of officers 'filing charges of one hind against an employee and haring him removed from the service or reduced in salary on evidence submitted by the officer on matters entirely foreign to the original charges that the employee has answered in writing.
Men in official positions will hesitate to trump up charges against an employee for the purpose of satisfying some personal animus or a political grudge * * *. (Emphasis added.)
Faithful to the spirit in which Congress adopted the provision, this court has consistently held that it was meant “to afford the employee a fair opportunity to oppose his removal, and the charges must be considered with the view of determining whether plaintiff was informed of the basis of the proposed action with sufficient particularity to apprise him of allegations he must refute or acts he must justify. The technical rules of criminal proceedings are not applicable here, and the facts and circumstances of a particular case are regarded as important in such an inquiry” (emphasis added). Burkett v. United States, 185 Ct. Cl. 631, 634, 402 F. 2d 1002, 1004 (1968), and cases cited therein.
The fatal defect that plaintiff perceives in the charges preferred against him is the omission of one based on his excessive use of alcohol — an indulgence that he freely *871 acknowledges and assigns as tlie source of all of the behavioral difficulties to which the MSTS authorities took exception. The argument runs that since alcoholism was not among the enumerated charges, the notice was invalid for failure to include “any and all reasons” for the proposed dismissal.
There are substantial infirmities in this approach.
First, there is no indication in either the legislative history or the interpretative case law that the statutory standard of sufficiency for a dismissal notice requires that it include every charge that could have been preferred against an employee. Such mandatory overkill would serve no rational purpose. More reasonably, the requirement is simply that the notice include those charges which would, if standing alone and reasonably established, justify the employee’s dismissal. This court has consistently held that a more subjective standard would be inappropriate. Atkinson v. United States, 144 Ct. Cl. 585, 601 (1959) ; Greenway v. United States, 175 Ct. Cl. 350, 357-58, cert. denied, 385 U.S. 881 (1966).
Second, in contending that the MSTS officials were really moved to dismiss him for a reason not included in his dismissal notice, i.e., excessive drinking, plaintiff must overcome the well-established presumption that those officials faithfully performed their assigned duties and acted in good faith. Greenway v. United States, supra, at 362. The possibility of agency motives other than those reduced to charges is not sufficient to invalidate the notice. Preble v. United States, 150 Ct. Cl. 39, 46 (1960). On the facts of this case, including plaintiff’s recently-past offenses for which he was, as a practical matter, on probation at the time of the charged infractions, even a confirmed skeptic could not reasonably conclude that the MSTS authorities were really moved to fire him for reasons other than those given in the notice, much less conclude that the avowed reasons represented “trumped up” charges.
Although plaintiff acknowledges, as well he might,[10] that the bare fact that alternative routes of appeal were made mutually exclusive as between agency channels culminating *872 with tb.e Navy Secretary on the one hand and the Civil Service Commission on the other, he contends that in this instance the enforced election was improper because he was not aware that an appeal to Civil Service entitled him to a hearing whereas the agency route did not. Whatever validity such a contention may have in the abstract, it is squarely at odds with the facts of this case — uncontroverted facts that must reasonably be deemed to preclude plaintiff from denying the knowledge necessary to the exercise of a fully informed and binding election.
Among plaintiff’s officially designated duties and responsibilities as a purser were: “Advising the Master and department heads concerning the correct procedures to be followed in disciplinary actions” and “Furnishing all crew members who so request, impartial advice concerning the provisions of the CMPI [Civilian Marine Personnel Instructions] pertinent to any disciplinary action.” (Finding 25, infra.) Those regulations expressly disclose that an appeal to Civil Service envisages a hearing before that body[11] and elsewhere specifically provide, with respect to the agency avenue that: “No hearing will be conducted on an appeal since the employee will have had an opportunity for a hearing prior to being disciplined.” (Finding 23, infra.)
Next, plaintiff urges that his removal should be set aside as so excessive a sanction as to be invalid as a matter of law.
When plaintiff committed the charged violations of Ship’s Orders concerning falsification of his time and attendance record for a day that he was AWOL and failing to note on his employment record the letter of reprimand that he received for being AWOL, he was still very much within a 2-year period of reckoning for having violated Ship’s Orders by being drunk on duty, insubordinate and absent without authority just a few months before (findings 3-5, infra). As to the effect of reckoning status on the severity of punishment for a subsequent offense MSTS regulations provide: “Once an offense has been committed for which penalty action has been taken, the employee is liable for two years after the offense to heavier penalties for subsequent offenses, regard *873 less of the nature of such offenses.” (Finding 6, m/m.) The current Ship’s Orders charges having to do with the AWOL matter were fully sustained by the evidence. In fact, they were not really disputed by plaintiff. In view of the earlier drunkenness and insubordination charges the current charges represented a second offense of violation of Ship’s Orders. MSTS regulations expressly specify dismissal as a maximum, penalty for either a first or second violation of Ship’s Orders (finding 19, infra). This court has consistently held that it is without its province to label as arbitrary an administrative judgment simply because, within a permissible range, it chose to impose the greater rather than the lesser penalty. Cohen, et al. v. United States, 177 Ct. Cl. 599, 620, 369 F. 2d 976, 988-89 (1966), cert. denied, 387 U.S. 917 (1967) ; De Nigris v. United States, 169 Ct. Cl. 619, 625 (1965).
Finally, plaintiff urges that when, on appeal, the MSTS Commander set aside[12] the charge of “conduct unbecoming a government employee” which was based on derogatory remarks concerning various MSTS masters and officers contained in a letter that plaintiff had written to an MSTS officer in the Atlantic Command,[13] it was incumbent that the entire matter be remanded to the initiating level for reconsideration of the appropriateness of the punishment imposed. As already noted, it cannot be disputed that the sanction of removal was within the permissible limits of punishment for a second offense against Ship’s Orders. Moreover, it should be recognized that the “conduct unbecoming” charge was not dropped because of insufficient evidence but because MSTS regulations required that it be preferred as a charge of breach of Ship’s Order No. 35 dealing specifically with defamatory and slanderous remarks directed to other MSTS personnel (finding 34, infra). In addition, plaintiff’s characterization of this charge as the “major” one against him must be regarded as gratuitous because the evidence simply does not substantiate that claim. On the other hand, the evidence before the MSTS reviewing authorities was plainly sufficient to support their affirmance of the remaining charges, particularly *874 those violations of Ship’s Orders arising ont of the AWQL incident. Since those charges, standing alone, are sufficient to justify the punishment imposed as a matter of law, this court’s long-standing view is that the agency’s dismissal action cannot responsibly be upset. Greenway v. United States, 175 Ct. Cl. 350, 357-58, cert. denied, 385 U.S. 881 (1966); Angrisani v. United States, 172 Ct. Cl. 439, 443-44 (1965); Atkinson v. United States, 144 Ct. Cl. 585, 601 (1959); Engelhardt v. United States, 125 Ct. Cl. 603, 606-07 (1953).
In sum, plaintiff may not recover.
FxNdxngs of Fact
1. Plaintiff, a preference eligible, with a total of more than 20 years of government sendee, was a purser in the Military Sea Transportation Service (MSTS), a branch of the United States Navy, at the time of the adverse action challenged by this suit.
2. On August 24,1960, plaintiff sent the following memorandum to the Commander, MSTS, Atlantic Area:
SUBJECT: CMPI (Civilian Marine Personnel Instructions) 1. Rumor has it that subject instruction is being placed in the mess rooms of Victory ships for information of the rabble, ship’s crew, that is. Currently it is irrelevantly a topic of discussion at the departmental safety meetings that the foregoing is in order. Naturally, they’re all hepped up on the subject. CMPI 1-9 reads “Civilian Marine Personnel Instructions are issued primarily for the use of officers of MSTS commands and ships. However, each command and ship is required to keep at least one volume available to employees for their information. The Purser’s Department should maintain a copy for employees aboard ship.” The 1st Officer, Chief Engineer argue that this means a copy of the OMPI should be hung up in the crew mess. The extra binder provided clearly reads “CREW — (Not To Be Removed From Purser’s Office). How do you spell this? And why the extra copy in the first place ? *875 indicate little, if any, understanding of the procedures, decorum and respect normally associated with correspondence addressed to the Commander * * *. This factor, together with the disparaging reference to crew members contained in [the memorandum] as well as the derogatory references to ship’s officers, unsubstantiated accusations and threatening insinuations [in the letter], connote an undesirable attitude incompatible with the standards expected of MSTS employees and cannot be tolerated in a Purser assigned to any ship of this command.
*874 On September 19, 1960, the Commander, MSTS, Atlantic Area, replied that the above memorandum, and a letter of the same date
*875 8. The Master is directed to advise Mr. Taylor that repetition of forwarding correspondence outside of established channels will be cause for appropriate disciplinary action.
3. On April 5,1963, plaintiff received a notice from MSTS stating that disciplinary action against him was being considered, because of am incident described in the notice as follows:
While assigned to the USNS McGRAW, on or about 27 March 1963 at New York, you were on duty while under the influence of intoxicants.
Plaintiff was given the option of answering the above charge personally or in writing. He answered in writing, generally admitting the truth of the charge (“All we pursers drink in port”), but denying that he was “paralyzed drunk.” In the course of plaintiff’s answer, he referred to the master of the USNS McGRAW, who had required plaintiff to undergo a blood alcohol test on March 27, 1963, as a “master moron,” “johnny-come-lately,” “tyrant and bum,” and a “moron.” The blood analysis showed plaintiff to have been “strongly under the influence of alcohol”, i.e., 2.9 milligrams of alcohol per millimeter of blood.
4. On May 8, 1963, plaintiff was furnished a Notification of Disciplinary Action, containing three charges:
(a) Failure to comply with ship’s orders
(b) Conduct unbecoming a government employee
(c) Failure to report for assignment and unauthorized absence.
*876 Those charges were detailed as follows:
(a) While assigned to the TJSNS McGRAW, on or about 27 March 1968, you were on duty while under the influence of intoxicants. Violation of Ship’s Order No. 7.
(b) In written reply to Disciplinary Report, Section A-l dated 5 April 1963, you referred to the Master, USNS McGRAW, as “Master moron”, “Johnny-come lately”, “apparently is a tyrant and a bum”, and “moron”.
(c) You failed bo report on or about 24 April 1963 for assignment as Assistant Purser. Thereafter to date you were absent without authority.
Plaintiff was given the option of replying in person or in writing, and was also given the option of having a hearing. He replied to these charges in writing, stating with respect to the first charge: “I probably was under the ‘influence’ but was capable of working.” He admitted that the two other charges were true.
5. The Notice of Decision on the above charges was issued on June 6, 1963. The decision was to suspend plaintiff for 30 days, effective the previous May 13. It stated:
Any further offenses on your part in the next two years may result in more severe disciplinary action.
6. Civilian Marine Personnel Instructions (CMPI), Instruction 750 (March 22,1963) (Unpublished), Disciplinary Actions, Section 1-7, provides:
RECKONING PERIODS. — This Instruction provides for a reckoning period to follow each offense which results in a penalty. A uniform two-year reckoning period is established regardless of the gravity of the offense or the penalty. The reckoning period begins with the date of the offense. Once an offense has been committed for which penalty action has been taken, the employee is liable for two years after the offense to heavier penalties for subsequent offenses, regardless of the nature of such offenses. If the employee maintains a clear record with MSTS for two years after an offense for which a penalty was imposed and then commits an offense, a first offense penalty is required. A break in service does not stop the running of the reckoning period in the event an employee is separated and subsequently re-employed within the reckoning period. For example, *877 an employee who had served one year of the reckoning period, resigns and subsequently is rehired within the reckoning period would still be in a reckoning period following rehire until the expiration of two years computed from the date of the offense.
Section 1-3 of the same unpublished regulation provides:
DEFINITIONS. — For purposes of this Instruction, the terms 'below will carry the meanings indicated:
* * * *
g. Reckoning, period. — The two-year period following each offense which results in a penalty. Any offense committed during this period may warrant a heavier penalty.
7. On June 12,1963, Commander J. A. Mercadante (whose exact position in the MSTS is not disclosed by the record) made the following memorandum of a discussion, between himself and plaintiff, concerning disciplinary action which had been taken:
a. The offenses with which he was charged were most serious and warranted removal action. Such action was most seriously considered.
b. Since his official record was clean, the Admiral elected to impose 30 days suspension in lieu of dismissal. However, I impressed upon him. the fact that if the reams of other papers written by him were made “official records” he would have received the greater penalty.
_ c. Any further infraction of regulations would leave him wide open for dismissal.
d. That his professional ability was excellent; however, professional competence alone was not sufficient. Since he was an officer, he must maintain officer like qualities in all dealings with ship’s personnel. His demonstration of these qualities left much to be desired. His conduct must be such as to set an example for all non licensed personnel. Only in this way could he gain the respect of his fellow officers and crew.
$ # ‡ ‡
4. We discussed his future assignment. I told him we proposed to put him back to sea at his permanent rate of Assistant Purser and asked whether he had any preference of ship. He stated that he would prefer sailing with Nielson or McPheron. I told him we could arrange this, but ships would not be in New York until 24 or 25 June. I told him that in view of his being in a non-pay status, *878 we would put him in the Beceiving Section until ship came hack in order for him to receive pay. He stated that he appreciated this but preferred to remain on leave without pay until assigned.
5. In parting, Mr. Taylor assured me that we would not have any more problems concerning his drinking, letter writing, or lack of officer like qualities.
Commander Mercadante made the following Memorandum for the Eecord on 28 June 1963:
Mr. Taylor was offered and accepted the Purser (FB) position aboard the USNS ELTANIN this date under the following conditions. Mr. Taylor agreed to act as an officer and a gentleman at all times while assigned to the USNS ELTANIN. Cdr. Mercadante emphasized the importance of good conduct in view of the following:
a. Taylor’s previous record
■b. Dealing with scientists aboard the USNS ELTANIN who are in direct contact with Washington, D.C.
c. Project ships are the pride of COMSTS and particularly, Admiral Gano. Consequently, any adverse comments would ultimately reflect on Admiral Johnson and MSTSLANT. In turn Cdr. Mercadante and LTJG Vaughn would be held responsible for any adverse circumstances which develop as a result of Taylor’s assignment to the USNS ELTANIN.
Taylor acknowledged the complications which could develop and accepted the assignment stating “You will have no trouble with me”.
8. On July 6,1963, plaintiff assumed the position of purser aboard the USNS ELTANIN.
9. On July 26, 1963, plaintiff was officially reprimanded by his captain for unauthorized leave from his ship, the ELTANIN, for approximately 8 hours on July 24,1963, at Valparaiso, Chile.
10. The letter of reprimand was delivered to plaintiff on July 27,1963. Under MSTS regulations it is the duty of the purser to post disciplinary action on each employee’s Employment Eecord Card. Plaintiff made no entry on his Employment Eecord Card regarding the letter or the fact of his reprimand until November, 1963, when he was ordered to do so by the ELTANIN’s captain, G. W. Fladerer, who discovered plaintiff’s omission at that time. The regulations *879 also require the purser to forward a copy of each disciplinary action to the MSTS Industrial Belations Office at the conclusion of the voyage on which such actions occur. Plaintiff did not so forward a copy of the letter of reprimand of July 27, 1963.
11. MSTS regulations direct the purser to maintain a time and attendance record for each crew member. Plaintiff’s Time and Attendance Card for the period 16-23 July 1963 showed him as having been on duty on July 24,1963 when, in fact, he had been AWOL. He had, of course, been paid on the basis of information shown on his T&A Card.
12. In October 1963, Captain Fladerer formally requested MSTS to relieve plaintiff of his duties on the ELTANIN and recall him to the United States. This request was prompted by the factors mentioned in the captain’s Special Voyage Eeport made in November 1963. Under the caption “SPECIAL PBOBLEMS” the following remarks appeared:
1. Conduct and duty performance, Mr. Vernon E. Taylor, Purser, MSTSA11494.
(a) Mr. Taylor joined the ship’s complement about noon on 6 July 1963. Shortly thereafter, I was introduced to Mr. Taylor and noticed with apprehension that employee was inebriated.
(b) His craving for, and indulgence in the use of intoxicants has known no bounds during two (2) inport periods. Administrative responsibilities have progressively deteriorated under his direction due to his lack óf attention or caring.
When taken to task for his propensities, his hew and cry is “it will be done tomorrow”, or “I’ll straighten out once we put to sea”.
This brashness prompted the necessity of dispatching Msg 241900Z July requesting Mr. Taylor’s recall to CONUS. As the seriousness of this action became apparent, he appealed to me to reconsider, this was granted and the request for a replacement was rescinded with the mderstanding that this respite would serve as a probationary period towards his future conduct.
During our last call at Valparaiso, Mr. Taylor promptly dismissed all restraint and promises of good behavior, returning postehaste to his former influences.
His allegiance to intoxicants is paramount, administrative duties become secondary. What little work that is *880 done, is accomplished in a fumbling irresponsible manner. Papers and documents become lost or misplaced, adding tenfold to his confusion. Official mail was stacked and thrown haphazardly in the ship’s office. Sixteen (16) days later, while at sea interdepartment routing of official correspondence was made.
Mr. Taylor’s appearance, grooming, and condition of clothing are that of complete slovenliness. This condition does not alter whether he is ashore or on board. It has been necessary for this officer to order Mr. Taylor to shave and change into clean clothing.
This lack of self pride and lack of enthusiasm towards his chosen responsibilities have been detrimental to the reputation earned by the ELTANIN, and to the prestige of MSTS in general.
Dr. James Lay, Ship’s Physician, was called upon to render his professional assessment concerning Vernon Taylor. His diagnosis and opinion are outlined in Enclosure No. (1).
Message 111930Z (October) was dispatched alerting COMSTSLANT and requesting necessary replacement for the above named employee.
13. The ship doctor’s report of November 10, 1963, submitted with the master’s Special Voyage Report, referred to above, stated that plaintiff had an above-average intellect but was suffering from emotional maladjustment that left him in chronic despair to which he reacted by consuming very large quantities of alcohol in an attempt at self-destruction. He recommended psychiatric examination and treatment of plaintiff.
14. On December 5, 1963, plaintiff wrote to Cdr. J. A. Mercadante concerning Captain Fladerer’s Special Voyage Report, a copy of which plaintiff had received sub rosa from the ship’s storekeeper. In this extended letter, he described Captain Fladerer as “a bantam rooster,” “out to fry me,” “incapable of reflection and all eagerness for revenge,” “a veritable maniac,” “a cruel and vindictive nature.” He referred to one of his former masters, Mr. Christian, as “sadistic”; to another, Mr. Symchik, as “a nut”; to a large number of other masters and first officers as “not literate but most of them were gentlemen”; and to Captain Brown as “another gent I’d classify as having the social consciousness of a black *881 widow spider.” Several' pursers were referred to as “heavy drinkers.”
15. Pursuant to Captain Fladerer’s request, plaintiff was relieved of Ms duties as purser of the USNS ELTANIN on December 12,1963, while the ship was in port at Valparaiso, Chile, and returned to CONUS (Continental Urnted States).
16. On February 10,1964, plaintiff was directed to report to the Crewing and Receiving Branch forthwith, so that arrangements could be made for him to have a physical examination on either February 11, or February 13,1964. The examination was precipitated by the November 1963 recommendation of the ship’s doctor. Finding 13, supra. As of February 14, 1964, he had neither reported as directed nor explained Ms failure to do so.
17. On March 13, 1964, plaintiff was given an informal hearing by two members of the Industrial Relations Office, MSTS, to determine whether formal charges should be preferred against him. When asked why he had shown himself on duty July 24,1963 on Ms time card when, in fact, he had been AWOL that day, plaintiff stated that he had simply made an error. When asked why he had not forwarded to the Industrial' Relations Office a copy of Captain Fladerer’s reprimand letter of July 27, 1963 to him, as required by MSTS regulations, plaintiff replied that he did mail that office a copy of the letter some two months after the fact. When asked why he had not noted the fact of Captain Fladerer’s reprimand on his Employment Record Card, plaintiff replied that he had attached a copy notation of the disciplinary action to Ms card and had just not gotten around to posting the information on the card. When asked why he had made derogatory remarks about ship’s officers in Ms letter to Commander Mercadante, plaintiff said that in doing this he was only trying to defend Mmself in respect to the allegations made concerning Mm in Captain Fladerer’s Special Voyage Report. At the hearing plaintiff was informed that a charge of failure to Obey orders might also be preferred against Mm for not reporting, as directed, for a medical examination on February 13,1964. The Industrial Relations officers who conducted the hearing concluded that plaintiff’s *882 explanations in response to the potential charges about which they interrogated him were not acceptable. Accordingly, they recommended that he be removed from employment by MSTS.
18. On March 17, 1964, plaintiff received a formal notice of a proposed disciplinary action issued by the Industrial Eolations Officer, MSTS. Four charges were listed:
(a) Conduct unbecoming a government employee (i.e., the derogatory remarks about various captains and other personnel in the MSTS):
(b) Failure to comply with Ship’s Orders, detailed as follows:
While assigned to the USNS ELTANIN, you certified the time and attendance for the period 16-31 July 1963 which indicated you were on duty 24 July 1963. You were not on duty on 24 July 1963. Violation of Ship’s Order #2.
(c) Failure to comply with Ship’s Orders, detailed as follows:
On 27 July 1963 you were given a letter of reprimand for unauthorized absence on 24 July 1963 from the USNS ELTANIN. You failed to post this disciplinary action on your Employment Eecord Card. Copy of this disciplinary action (Disciplinary Beport — Section B(l) of 26 July 1963) was not received in this headquarters. Violation of Ship’s Order #2.
(d) Unauthorized absence, detailed as follows:
Failure to report to the Crewing & Beceiving Branch on or before 13 Feb ’64, as directed by Placement Officer on 10 Feb ’64.
Continued on the page following the above-quoted details of the charges was the following notation:
Prior offenses:
(1) 27 March ’63, under the influence of intoxicants during working hours; on 5 Apr ’63, you made derogatory statements about the Master, USNS McGBAW; on or about 24 Apr ’63, failure to report for an assignment.
(2) 24 July ’63, unauthorized absence.
*883 The notice contained the following instructions and directions:
4. This notice of proposed adverse action is issued under the provisions of Section 14 of the Veterans’ Preference Act of 1944 which require that you be informed as follows:
(1) The proposed adverse action, if taken, will be effective no less than 30 calendar days from the day after the date of your receipt of this notice, unless COMSTSLANTAEEA, determines that adverse action should legally and properly be taken at an earlier date, in which case you will be so informed by him.
(2) You may answer the charge (s) appearing above personally and in writing and may submit affidavits to support your answer. Your written answer, if any, must be submitted within 5 calendar days of receipt of this notice.
5. The Employee Eelations Div., IEO [Industrial Eo-lations Office] is available to assist you in preparing your reply and to type your reply in Section C of this report, if you so request.
6. You may have a hearing, if you so request (see paragraph 2 of Section C). At such hearing you may be represented and may introduce witnesses as provided in CMPI 45.4^5b and d.
7. If you fail to reply within 5 days, the charge (s) in paragraph 1 will be considered fully sustained and your removal will be recommended to COMSTSLANT AEEA. If your reply or hearing produces evidence which I consider warrants a lesser penalty, action will be taken accordingly. You will be notified in writing of my decision in either case.
Ship’s Order No. 2 is as follows:
Crew members shall perform all assigned duties with promptness and dispatch and shall remain alert at all times while on watch or duty. (CMPI 750.8-Encl. 1)
19. CMPI 750.8-Encl. 3 contains a schedule of charges and the penalties thereof. For the charge, “Failure to Comply with Ship’s Orders,” the penalties are as follows:
First Offense-- Minimum penalty: None
Maximum penalty: Eemoval
*884 Second Offense_ Minimum penalty: 10-day suspension'
Maximum penalty: Removal
Third Offense_■ Minimum penalty: 30-day suspension
Maximum penalty: Removal
20. CMPI 750.8-Encl. 3, in its schedule of charges, lists as charge 2(a) “Unauthorized absence from the Receiving *Branch*.” For this charge the penalties established by CMPI 750.8-Encl. 3 are as follows:
First Offense_ Minimum penalty: None
Maximum penalty: 2-day suspension for each day or portion thereof of absence
Second Offense_ Minimum penalty: 10-day suspension
Maximum penalty: Removal
Third Offense_ Minimum penalty: 30-day suspension
Maximum penalty: Removal
21. On March 19,1964, plaintiff indicated that he did not want a hearing on this matter. Instead, he filed a 12-page handwritten response to the charges. In substance, his position in relation to each of the several charges was as follows. As to the derogatory remarks concerning various MSTS masters and other personnel made in his letter to Commander Mercadante (finding 14, supra), his position was that none of the statements contained in that letter should have been used against him because he did not intend it as an official communication. As to falsification of the attendance record that erroneously showed him as having been on duty July 24, 1963, his exculpatory explanation was simply that of mistaken oversight on his part. Regarding his failure to note the July 27,1963 letter of reprimand on his Employment Record Card, his explanation was that he had attached a copy of the letter to his record card as a reminder to him to make the appropriate notation on the card. He insisted that he had simply not gotten around to making the entry by November 1963, when Captain Fladerer examined his records and discovered that this had not been done. Further, he asserted that he had mailed the original of the reprimand letter to MSTS head *885 quarters in CONUS and postulated that it must have been included in a consignment of mail bags that had been lost and for that reason was never received by the addressee. Finally, as to the charge of unauthorized absence for failure to report to the Crewing and Keceiving Branch in connection with a scheduled physical examination, plaintiff contended that he failed to so report because he was under the impression that he was to be assigned to a ship that was not due in port for several weeks, the idea being that there was therefore no urgency involved, and that, in any event, he felt that he was not due for a routine physical examination or regular dhots.
22. The Commander, MSTS, Atlantic Area, in a decision dated 9 April 1964, held that the evidence supported charges (a) through (d), and notified plaintiff that he would be removed effective 20 April 1964. This notice of final decision contained the identical specific description of each charge that had been included in the notice of proposed disciplinary action, and a listing of “prior offenses” identical to that contained in the notice of proposed disciplinary action. The notice of final decision also contained the following notice of plaintiff’s appeal rights:
(Veterans who are removed, demoted or suspended more than thirty days.) You are advised of your right to appeal from tins adverse action. Such appeal must be submitted at any time after receipt of this decision but not later than 10 calendar days after the effective date noted above. Such appeal may be made:
(1) To the Commander Military Sea Transportation Service via Commander, home port; (See CMPI 750.8-Encl. 7) or
(2) To the New York Region U.S. Civil Service Commission 220 East 42nd Street New York, New York 10017
If you elect to appeal to the Civil Service Commission, any appeal rights through Navy channels will be forfeited. If you elect to appeal to COMSTS you may, upon receipt of the decision of COMSTS, if you are not satisfied, appeal further either to the Office of the 'Secretary of the Navy or to the U.S. Civil Service Commission. However, if you elect to appeal to the Office of the Secretary of the Navy you forfeit any right of appeal to the Civil Service Commission or, conversely, if you appeal to the *886 Civil Service Commission you forfeit any further right of appeal through Navy channels. Instructions concerning submission of an appeal to the Civil Service Commission are on the other side of this notice. A copy of any such appeal should be sent to the Commander, home port.
APPEALS TO THE CIVIL SERVICE COMMISSION BY VETERANS WHO HAVE BEEN REMOVED, DEMOTED OR SUSPENDED FOR MORE THAN 30 DAYS
To be acceptable, an appeal addressed to the office of the Civil Service Commission shown on the other side must:
a. Be in writing.
fo. Set forth in detail all of the facts and circumstances of the adverse decision.
c. Be accompanied by copies of charges, answer, affidavits in support of answer and notice of the adverse decision and by such documentary evidence in support of the appeal as the employee may wish to submit.
d. State whether the employee desires to make a personal appearance or an appearance through, or accompanied by, a representative designated by him before a representative of the Commission.
e. Be supported by acceptable evidence of entitlement to veteran preference.
f. Set forth detailed information regarding the employee’s status such as the date and nature of appointment and whether the employee has completed one year of current continuous civilian marine employment, and any other data bearing on whether the employee is within the purview of Part 22 of the Commission’s regulations.
23. Civilian Marine Personnel Instructions (CMPI), Instruction 750 (March 22,1963) (Unpublished), Disciplinary-Actions, Sections 6-3, 6 — d, and 6-5 provide:
6-3 PROCEDURE III.
a. This procedure covers any veteran preference civilian marine employee who has completed a trial period, or 12 months of current continuous employment, when the penalty is suspension for more than 30 days, demotion or removal.
b. Procedure. — Any employee in this category upon receipt of the notice of adverse decision of the commander, home port, has the right of appeal
*887 (1) direct to the U.S. Civil Service Commission after receipt of the notice of final decision of the commander, home port. In the event the employee elects this avenue of appeal he forfeits all rights of appeal to COMSTS and the Office of the Secretary of the Navy,
(2) to the Commander Military Sea Transportation Service and upon receipt of decision by COMSTS, if adverse, to appeal further to the Office of the Secretary of the Navy; or, after receipt of decision 'by COMSTS, if adverse, to appeal to the Civil Service Commission. However, in those instances where the employee elects to appeal further to the Office of the Secretary of the Navy following COMSTS decision he forfeits any right of appeal to the Civil Service Commission, or if the employee appeals to the Civil Service Commission following COMSTS decision he forfeits further right to appeal to the Office of the Secretary of the Navy.
6-4. TIME LIMITATIONS. — In general, an appeal from disciplinary action either to COMSTS or to the Civil Service Commission will not be entertained if submitted more than 10 calendar days after the effective date of the action. Further appeals to the Office of the Secretary of the Navy or the Civil Service Commission, as provided in 6-3b(2) above, must be submitted within 10 calendar days after receipt of COMSTS decision. Exceptions may be made when unusual circumstances prevent timely submission of the appeal.
6-5. SUBMISSION OF CASES.
a. Action by the appellant. — Appeals and requests for administrative review submitted under these procedures will be initiated by the appellant’s addressing a letter to the appropriate authority as indicated in the above procedure. Such letter must outline the basis for the appellant’s request that the decision be changed. The outline in enclosure' 7 should be followed in submitting such appeals. The appellant may submit any additional evidence or affidavits which he believes support his position in the appeal. The Purser Department or the Industrial ^Relations Office will provide typing assistance upon request.
b. Official action. — No hearing will be conducted on an appeal since the employee will have had an opportunity for a hearing prior to being disciplined. The reviewing authority will make his decision wholly on the basis or *888 the information contained in the record which shall include any information submitted by the employee as permitted by 6-5a above. Forwarding officials will submit complete records and any additional information concerning the appeal which is considered necessary to an understanding of the issues. When the appeal is addressed to COMSTS or to the Office of the Secretary of the Navy the personnel folder of the employee concerned will be forwarded with the case. An impartial brief of the issues in the case will be prepared in the home port and forwarded in quadruplicate with the file. The brief should be a factual narration. The brief will contain five sections.
Introductory statement
2) Background
31 Position of appellant
41 Position of command
5) Status of employee during any notice period (duty, leave, etc.)
It is important that the brief represent a; distillation of facts contained in the record. The inclusion of material in the brief which is not a matter of record in the larger file on the case would make the brief essential for a complete file and since these briefs prepared by the commands are not official parts of the file, such practice must be avoided. The opinions and recommendations of the commander, home port, will be included in the forwarding endorsement, thereby putting these matters over his signature. (The case file on appeals and administrative reviews will be arranged and tabbed in accordance with the requirements set forth in NCPI lYO-Encl. 2.)
c. Appeals to COMSTS. — An appeal by a civilian marine employee to COMETS from an adverse disciplinary decision will be submitted via the commander home port. The commander, home port, will review the case on the basis of procedural compliance and merit. If the commander, home port, is of the opinion that the appeal of the employee should be sustained, either because of procedural irregularity or for reason of merit, the commander, home port, Shall inform the employee in writing, via the Master, of the decision and shall direct the appropriate action to effect the affirmative decision, which will close the case. If the review results in the conclusion that partial or mitigating action in favor of the employee should be taken, the commander, home port, shall inform the employee in writing, via the Master, of the decision and shall direct the appropriate *889 action to effect the decision. The letter to the employee shall advise him of his right, if he so desires, to continue Ms appeal to COMSTS and also that his request for continuance must be made in writing via the Master and the commander, home port, within 10 calendar days from the date the decision is effected or the employee is notified, whichever is later. If the commander, home port, does not uphold the employee’s appeal, or takes only partial or mitigating action in favor of the employee and the employee desires to continue his appeal, the commander, home port, shall prepare a brief of the case which will conform to the format set out in 6-5b above, for submission to COMSTS. The employee shall be furnished a copy of the forwarding endorsement.
d. Consideration and decision of COMSTS.— COMSTS will review the appeal case record and render his decision. Notification of the decision will be made in writing to the appellant via the commander, home port. If the decision does not uphold the appellant or provides partial or mitigating action in favor of the appellant, with the exception of appeals from reprimand, the notification will also advise the appellant of Ms right to appeal the decision to the Office of the Secretary of the Navy.
e. Appeals to the Office of the Secretary of the Navy. (1) General. — If the employee is not satisfied with the decision rendered by COMSTS, with the exception of appeals from reprimands, he may make a further and final appeal to the Office of the Secretary of the Navy in accordance with the appeal rights provided by tMs Instruction. Appeals will be forwarded to the Office of the Secretary of the Navy via the commander, home port, and COMSTS. There is no further administrative appeal within the Department of the Navy.
(2) Submission of the appeal. — An appeal to the Office of the Secretary of the Navy must be submitted by the employee witMn 10 calendar days after he receives the decision of COMSTS. Such appeals shall be submitted in writing and should contain the information as shown in 6-5a, above.
(3) Assistance to the employee in submitting appeals. — Technical assistance of the Industrial Relations Office, and typing aid, will be available to the employee, if ashore, in connection with an *890 appeal. The Purser Department oí the ship in which the employee is serving will render similar assistance to the employee in an appeal which is submitted when the employee is at sea.
f. Action when appellant separates or separation is contemplated. — When an appellant is separated, or separation is contemplated, an appeal from a disciplinary action which is in process will be continued to completion.
24. Civilian Marine Personnel Instructions (CMPI), Instruction 750 (March22,1963) (Unpublished),Disciplinary Actions, Section 7, APPLICABLE PROVISIONS OF THE NCPI, provides in part:
7-1. CROSS REFERENCE TO NCPI 750. — The provisions of NCPI 750 listed below will be binding in making determinations ashore concerning disciplinary actions involving marine personnel.
*****
d. NCPI 750.7 — CIVIL SERVICE COMMISSION HEARINGS AND APPEALS FROM DECISION OF THE COMMISSION.
*****
Navy Civilian Personnel Instructions (NCPI),
Instruction 750 (June 15, 1962) (Unpublished) Section 7, CIVIL SERVICE COMMISSION HEARINGS AND APPEALS FROM DECISIONS OF THE COMMISSION, paragraphs 7-1 and 7-2 provide:
7-1. GENERAL POLICY.
Whenever possible, heads of activities, or their designated representatives, should be present at hearings held by the Civil Service Commission involving their employees who have appealed to the Commission from disciplinary action taken under Procedure “B5’ of this Instruction.
7-2. EXCUSING EMPLOYEES TO ATTEND COMMISSION HEARINGS
a. The provisions of NCPI 630 are applicable. The employee who has appealed to the Civil Service Commission and his representative and witnesses shall be considered to be in a duty status while attending and while traveling to and returning from the hearing held by the Commission whether the hearing is held on or off the premises of the local activity. Also, any witnesses *891 who are requested to appear at the hearing by the Commission or by the activity shall be considered to be in a duty status. However, the Commanding Officer may limit the number of witnesses to be provided at any one time.
b. The appellant is responsible for the presence of his own witnesses at the hearing. The Commission will not request, nor will Navy officials compel, any Navy employee to be present at a Commission hearing solely because the appellant requests the presence of the employee as a witness. If such request is made by the appellant, action by Navy officials will be 'limited to making the request known to the employee, and each employee must exercise free choice as to whether he wishes to appear as a witness for the appellant. Any employee who elects to serve as a witness for the appellant, and who is accepted by the Commission representative hearing the case, will be excused as provided in a, above.
25. Civilian Marine Personnel Instructions (CMPI), Instruction 750 (March 22,1963) (Unpublished), Disciplinary Actions, Section 2, RESPONSIBILITY EOR DISCIPLINE, provides:
2-5. SPECIAL RESPONSIBILITIES OF THE PURSER. — In addition to the responsibilities in 2-4 above [DEPARTMENT HEAD], the Purser will be responsible for:
Advising the Master and department heads concerning the correct procedures to be followed in disciplinary actions.
b. Furnishing all crew members who so request, impartial advice concerning provisions of the CMPI pertinent to any disciplinary action.
Assisting any employee in the preparation of a clear and concise statement in reply to a charge. (This should not involve advice to the employee concerning a possible defense.) Providing any employee with technical assistance, and typing aid in connection with his reply to a charge.
d. Preparing necessary forms and reports as required by Section 5 below. (The Purser may properly be expected to prepare only one final draft of an employee’s reply to charges.) _
_ e. Recording disciplinary actions on the Employee Ship Record as required by 1-9 above.
*892 26. By a 5-page memorandum dated April 19,1964, plaintiff appealed the Atlantic Area Commander’s decision (finding 22, supra) to the Commander, MSTS. Under the caption “Corrective action desired:” plaintiff proposed: “a. Suggest removal action stand, b. But, respectfully request that I be re-employed in a FICA status and placed in a trial-period for 1 year, placement to be on say, a P2 vessel like the ROSE where I will come under adequate supervision.” In support of his request for probationary re-employment plaintiff asserted that: “Excessive drinking is the direct cause of my predicament, regardless of my explanation to the contrary, * * Plaintiff insisted that he had stopped drinking and wanted the opportunity to prove to the MSTS that he had reformed — hence the request for a probationary reappointment.
27. On April 27, 1964, plaintiff submitted to the MSTS Commander a 2-page supplement to his appeal of April 19, referred to in the preceding finding. In addition to renewing his request for a probationary reappointment plaintiff directed his comments to the unbecoming conduct charge based on the derogatory statements contained in his December 5, 1963 letter to Commander Mercadante. Finding 14, supra. Thus, he stated that he had attached a note to that letter expressly stipulating that the letter was personal and not to be regarded as official. In addition, with regard to his difficulties with Captain Fladerer on the ELTANIN, plaintiff stated that he had not wanted to be assigned to that ship in the first instance but had been prevailed upon by his MSTS superiors to accept the assignment despite his personal misgivings based on the ship’s schedule of 60-day voyages.
28. On April 30, 1964, plaintiff sent the Commander, MSTS, a 1-page “Addendum” to his April 19 appeal. In this statement he asserted that he had, in fact, been physically ill at the time that Captain Fladerer removed him from his purser’s position aboard the ELTANIN.
29. By a memorandum of May 7,1964, the MSTS Atlantic Area Commander transmitted the file on plaintiff’s removal proceeding to the Commander, MSTS, with the recommendation that plaintiff’s appeal of his removal be denied. A *893 copy of this communication was sent to plaintiff. Following a brief recapitulation of the charges the memorandum stated:
d. Prior offenses considered in the removal action are:
(1) On 27 March 1963, he was under the influence of intoxicants during working hours while assigned to the TJSNS McGRAW; On 5 April 1963, he made derogatory statements about the Master, TJSNS McGRAW; On or about 24 April 1963, he failed to report for an assignment — 30 day suspension. _
_ (2) On 24 July 1963, unauthorized absence while assigned to the TJSNS ELTANIN — Letter of reprimand.
4. Mr. Taylor’s contention that the charges based on his letter of 5 December 1963 are illegal is invalid. It is considered that his remarks became a matter of official concern when he included his 5 December 1963 letter as an enclosure to his letter of 23 February 1964. Further, Mr. Taylor’s explanation that his remarks were misinterpreted is not accepted. His remarks reflect adversely upon the character and efficiency of the persons whom he named.
5. When he received a thirty (30) day suspension for his misconduct in March 1963, Mr. Taylor was informed that any further infraction of regulations would make him liable to dismissal from the service. Mr. Taylor indicated that there would be no more similar problems from him. However, shortly after Mr. Taylor’s assignment to the TJSNS ELTANIN on 7 July 1963, he was absent without permission from 0800 to 1600 on 24 July 1963 at Valparaiso, Chile. The Master decided to ask for a replacement but reconsidered after Mr. Taylor appealed to him. The Master gave him a letter of reprimand.
6. Mr. Taylor has resisted and ignored all attempts to correct his behavior. COMSTSLANT recommends that Mr. Taylor’s appeal be denied.
30. On May 10, 1964, following his receipt of a copy of the Atlantic Commander’s transmittal letter and recommendation to the MSTS Commander on his appeal (finding 29, above), plaintiff wrote the Atlantic Commander a 3-page critical commentary on the adverse recommendation, again emphasizing his employment longevity and charging parti *894 ality and bias in the evaluation of his appeal. On the same date he wrote the MSTS Commander a 2-page memorandum of comments on the Atlantic Commander’s May 7 letter. As enclosures to 'this memorandum he included a copy of his May 10 letter to the Atlantic Commander and copies of his, April 27 and April 30 supplements to his appeal; the latter documents on the theory that the Atlantic Commander might not have sent the originals along with the appeal file. In this memorandum plaintiff acknowledged that he was aware at the time that he had improperly failed to note on his Time and Attendance record the fact that he was absent from duty on July 24,1963; that failure being one of the charges preferred against him. See finding 18, sufra.
31. On May 13, 1964, plaintiff wrote the MSTS Atlantic Area’s Industrial Relations Officer to ask how he went about filing a claim for sick leave for the period December 12,1963, the date that he was relieved of duty on the ELTANIN, and February 10, 1964, when he was directed to report for what was to have been a psychiatric examination. He also posed a rhetorical question as to whether he made a mistake in electing to appeal his removal through MSTS rather than the Civil Service Commission. The letter then stated: “I know for a fact that LANT has been out to get me for years. It doesn’t matter that you finally accumulated enough charges— you would have found, or created them, anyway.”
32. On May 14,1964, plaintiff wrote a 3-page letter to the Commander, MSTS, Washington, D.C. In material part, the letter stated as follows:
1. I think I defended myself to best advantage incorrectly in my basic appeal, and in my supplement and addendum thereto, that is, from a legal standpoint. All of my material is important, of course, in explaining my position and in providing background information incident to the case.
2. However; the charges should be taken individually, in both the McGRAW and ELTANIN affairs, to prove whether these charges are enough basis for REMOVAL. My silly memos, my equally siSy telegrams (sent for no reason at all except comedic) should be disregarded. In other words, actual charges alone should be the basis for removing -me from MSTS.
*895 3. With that in mind, I submit each charge against me, on both ships, my comments thereof, etc. My basic appeal, supplement and addendum thereto, are therefore offered as supporting documents. THIS IS MY EEAL APPEAL, and I present it after much consideration.
4. SO. Consider the McGEAW charges:
(a) Failure to comply with ship’s orders (Under the influence of intoxicants). Proved by blood test; but I had been determined “Fit for Duty” by Dr. Eao, Base Dispensary, and was capable of working.
(b) Conduct unbecoming a government employee. Made derogatory remarks (according to LANT) in defense of the foregoing charge. This, to me, was tantamount to compounding a charge.
(c) Failure to report for assignment and unauthorized absence. This was again in the nature of compounding charges. I consider this charge distinctly out o? order. (See my other remarks in my appeal).
Further, LANT even had me up for Eemoval as a result of these charges, even though I don’t think it was quite in order (considering the deterrent factor) , because I had had no charges against me for the past several years, as borne out by my personnel employment card. It is my contention that even at this stage, LANT was out to oust me on general principles (probably weighing my letter writmg, my attitude, etc.).
But, in the final analysis, these three McGEAW charges were deemed mitigating circumstances, and I received a 30-day suspension.
5. Now as for the ELTANIN charges:
(a) AGAIN — Conduct unbecoming_ a government employee. This charge I consider illegal (and certainly unfair). I am not a lawyer. But the important point is my INTENTION in sending the memo to Code L-5. The use of the copy of this memo to assert it to be of official concern, and hence a legitimate charge, is considered doubtful to me (I think LANT unfairly seized upon this copy as a means of adding a very considerable grave charge against me.)
(b) and (c) Failure to comply with ship’s orders, vis—
(1) Falsifying T&A card and;
(2) Failure to post Eeprimand on personnel card, and failure to send copy of Eepri-mand to LANT.
*896 Both of these charges are unproven, are therefore of no merit, are invalid, in fact and out of order. They should not exist because it is impossible to prove that I am guilty of these two charges.
(d) Failure to report to Crewing & Beceiving Branch on or before 13 Feb 1964. This charge I consider completely out of order, and within the province of procedural error (see my addendum to
6. breaking charges, what do we have left in the way of substantial legally based charges requisite to a serious charge of REMOVAL? I shall list them in order:
McGRAW:
Proved. But I was capable of
b) Proved. But of a compounded nature,
c) Not proved. I had asked for LWOP in good time.
ELTANIN:
(a) Illegal and unfair. Memo was informal and personal. Intention in sending memo is of paramount importance. How does this stand up from a legal standpoint? (Remember, memo wouldn’t even exist except that I was given a copy of Master’s Special Report by the Yeoman-Stkpr) I think I had proved in my dispatch that both the ship and LANT were out of order in taking me off the ship. If the ship had been in New York or close vicinity, then the captain’s report could have been checked at first hand. But thousands of miles from home base, and where one was supposed to stay on the ship unless removed in an emergency situation. The Captain’s report, and the doctor’s were merely opinions. LANT erred, in my opinionj in not verifying the charges, by either asking for charges against me (of which there were none), or making a telephone call to ascertain whether a concrete foundation for the relief was justified. In this LANT backed the Master, which I considered in the nature of quasi-military censorship.
(b) and (c) Unproven, out of order.
(d) Out of order. And procedural error.
7. So what do we have in the final analysis:
McGRAW Charges: All mitigating. Let’s say the first two are substantial charges, tho the second was of a compounded nature.
*897 ELTANIN Charges: All are of a mitigating and, in the instance of (b) and (c), extremely doubtful and impossible of proving; therefore, out of order. The last charge is, in my opinion, a procedural error. The AWOL is a legitimate charge, but even that one I consider morally wrong because I had compensated for the absence by working many hours on my own time.
8. So that honestly, COMSTS, I don’t think there are sufficient legitimate charges against me to constitute a REMOVAL. This is technically speaking, disregarding any telegrams, letters, memos, etc. that may have been considered in my removal.
Respectfully submitted,
[S/3 V. E. Taylor.
33. On June 15, 1964, Admiral Gano, the Commander, MSTS, rendered his decision on plaintiff’s appeal. This decision stated in pertinent part:
*****
2. Consideration has been given to the evidence contained in the record and your statements in your letter of appeal of 10 May 1964 and the subsequent letters received from you. Upon review, I find that the charge of “conduct unbecoming a government employee” is procedurally incorrect in this instance and is, therefore, set aside. Your appeal is being adjudicated on the basis of the remaining charges of two offenses of failure to comply with Ship’s Order 2 and unauthorized absence.
3. I find that the evidence in the record fully supports the charges of failure to comply with Ship’s Order 2 and unauthorized absence for failure to report to the Receiving Branch on or before 13 February 1964 as directed. It is my opinion that the disciplinary action taken was justified; that you have been afforded all the procedural safeguards to which you are entitled; and that your removal was warranted. Therefore, your appeal is denied.
4. You may, if you wish, appeal this decision in writing to the Office of the Secretary of the Navy via the Commander Military Sea Transportation Service, Atlantic Area and the Commander Military Sea Transportation Service or to the New York Region, U.S. Civil Service Commission, New York, New York. However, if you elect to appeal further to the Office of the Secretary of the Navy you forfeit any right of appeal to the Civil Service Commission or if you appeal to the Civil *898 Service Commission you forfeit your right of further appeal to the Office of the Secretary of the Navy. Your appeal may be submitted at any time but not later than 10 calendar days after receipt of this decision.
34 In a letter of June 15,1964, to the Commander, MSTS, Atlantic Area, Admiral Gano gave the following explanation of why the first charge had been set aside as procedurally incorrect:
* * * CMPI 750.3-2g provides for the use of this charge “if information is brought to the attention of management which reflects adversely upon the suitability and general fitness of an employee, when such information relates to activities other than those directly related to his employment with MSTS.” The circumstances in Mr. Taylor’s removal action did not meet those requirements. Further, an appropriate charge was available under the Ship’s Orders.
As to paragraph 2, quoted above, Civilian Marine Personnel Instructions (CMPI), Instruction 750 (March 22, 1963) (Unpublished), Disciplinary Actions, Section 3-2g. provides:
Use of “conduct prejudicial to good order” or “conduct unbecoming a government employee”. — Charge #14, “conduct prejudicial to the maintenance of good order or discipline”, or charge #15, “conduct unbecoming a government employee” will be used for those offenses which are not more specifically covered by the Ship’s Orders or the Schedule of Charges. Charge #15 will be used if information is brought to the attention of management which reflects adversely upon the suitability and general fitness of an employee, when such information relates to activities other than those directly related to his employment with MSTS. As in all other cases, a specific description of the offense (s) must be included.
Ship’s Order No. 35 provides:
Crew members shall not make false or unfounded charges or statements which slander or defame other employees, superiors, or officers, or which reflect unfavorably on their honesty, integrity or efficiency.
35. Under date of July 8, 1964, plaintiff submitted a 10-page handwritten appeal to the Secretary of the Navy. In *899 the main, tbe document consisted of argumentation. In tbe limited portions of it tbat were directed specifically to tbe merits of tbe pending charges plaintiff made bis position quite clear. Noting tbat the unbecoming conduct charge bad been dismissed as procedurally defective, plaintiff added tbat “* * * charge(d) — ‘unauthorized absence’ is likewise ‘procedurally incorrect.’ Which means tbat I would have reported to Crewing on or before 13 Feb. 1964 bad I this intelligence beforhand [sic]. Tbe information, tbat is, tbat I was to be given a psychiatric examination.” Begarding tbe charges of violating Ship’s Order #2 by failing to forward to MSTS Atlantic headquarters tbe reprimand letter that be received for being AWOL and failing to note tbat disciplinary action on bis Employment Becord Card, plaintiff asserted:
I still cannot consider these two charges valid ones. They couldn’t bear up under legal scrutiny.
Jjs *1* H* *5*
Bef (a) [tbe MSTS Commander’s formal decision of June 15, 1964] states “tbat you have been afforded all tbe procedural safeguards to which you are entitled.” But I strongly protest. I have not been afforded “legal safeguards.” For instance, it’s a point of law, I think, tbat if there is insufficient evidence in a case, then the case is thrown out of court for tbat reason. Doubtful facts — not sufficiently incriminating to convict.
$ $ ‡ $
Consider these little details — (a) If I didn’t mail tbe original reprimand given to use on tbe “Eltanin”, how is it tbat I didn’t have it in my possession upon arrival CONUS ? Instead I gave a copy of the Beprimand to Mr. Cotter, IBO. (b) Another copy remains on tbe ship, (c) If I was going to tear any copies up, I would have destroyed them all — now wouldn’t I have? (d) I don’t say tbat I am incapable of such actions under other circumstances — but not under tbe present circumstances (which I have explained heretofore), (e) I did, in fact, post the reprimand to my employee record card — but at Captain Fladerer’s behest, (f) I could have posted the action on the card before I was called up to the captain’s office — it would only have taken a few seconds. * * * (g) How is it to be known, for a fact, that I wouldn’t have' *900 posted the reprimand had I been left to my own devices— and on the day of my discharge from the ship ?
* * -t $ *
The important point, despite whatever MSTS may think, is that these two charges cannot definitely be proven. They are therefore illegal. There is no other possible decision. I would be supported by any reputable lawyer. And certainly MSTS has employees with at least sufficient legal training to ascertain and come to such a conclusion. I contend I have not been afforded the legal “safeguard”.
$ $ $ $ $
Notably, plaintiff offered no exculpatory explanation in this appeal concerning the other charge based on violation of Ship’s Order #2 for the false entry that he made on his Time and Attendance Card for July 24, 1963, the day that he was AWOL.
36. Under date of July 24,1964, plaintiff sent the Secretary of the Navy a 2-page supplement to his appeal. In this document plaintiff pointed out that he had mentioned his letter of reprimand in his letter of December 5, 1963 to Commander Mercadante (finding 14, supra). This proved, he urged, that he had no intentions of concealment in failing to forward to MSTS Atlantic headquarters the notice of the reprimand.
37. Under cover of a letter dated July 31,1964, the MSTS Commander for the Atlantic Area transmitted plaintiff’s case file and Ms personnel file to the Secretary of the Navy. The transmittal letter, a copy of which was routed to plaintiff, concluded with the recommendation that the appeal be denied.
38. After receiving his copy of the communication mentioned in the preceding finding, plaintiff wrote the Navy Secretary, with a copy to the MSTS Atlantic Commander, a 5-page “final appeal” dated August 3, 1964. In content the document was primarily repetitive of plaintiff’s earlier written submission. By way of new matter, however, the following was included:
2. This case could be decided very simply. I had to wait two (2) months before any action was taken. During this period I was under the impression that I still had a job. Surely no reputable company would treat an *901 employee in this manner. As I have explained heretofore, this was due to poor coordination by LANT. This, in itself, would throw the whole case out of court, if conducted thru legal channels.
3. This, and the circumstances of my sick leave relative to my alleged unauthorized absence, is self-evident. One has only to read (I mean really read) the evidence.
39. On August 21, 1964, the MSTS Atlantic Area Commander wrote the Navy Secretary a 1-page letter referring to and commenting on plaintiff’s “final appeal” mentioned in the preceding finding. In pertinent part the letter stated:
2. Eeference (a) contained the case record relating to the charges upon which Mr. Taylor’s removal was based. The following comments are made regarding specific questions contained in enclosure (1) :
a. When Mr. Taylor was separated on 12 December 1963 from the USNS ELTANIN (T-AGOR 8), he remained in South America of his own volition. Upon his return to New York, Mr. Taylor could not be reached at his address of record. He was finally contacted on 10 February 1964.
b. Mr. Taylor is not considered entitled to sick leave from 13 December 1963 to 6 January 1964 since he remained in South America of his own volition for vacation, without prior approval or knowledge of COMSTSLANT.
c. COMSTSLANT does not consider that the circumstances of Mi\ Taylor’s violation of Ship’s Orders are mitigating.
40. The Secretary of the Navy rendered his decision in a letter to plaintiff dated September 22,1964, which stated in pertinent part:
2. The record shows that you were removed from employment effective 20 April 1964 for two violations of Ship’s Order #2, unauthorized absence on 13 February 1964, and your prior record of offenses for which you were still in a reckoning period. There is no question based on the evidence that, as of November 1963, you had made no correction to the time and attendance report for 16-31 July 1963 to reflect that you were not in a duty status on 24 July, nor had you entered on your Employment Record Card the letter of reprimand dated 26 July which was issued for unauthorized absence on 24 July. Accordingly, each of these charges is sustained, and the fact that you acknowledged your absence on 24 July, in *902 a letter dated after the Ship’s Master discovered the infractions, cannot serve to mitigate the seriousness of the offenses.
3. The charge of unauthorized absence on 13 February 1964 is also supported by the evidence and is sustained. The Placement Officer had the authority to order you to report to the Crewing and Receiving Branch on 13 February. The fact that you were declared not fit for duty on 17 February 1964 by the Director of the Industrial Medicine Division, MSTS Atlantic Area, cannot serve as a defense since the record indicates that you were not under a doctor’s care between 12 December 1963 and 17 February 1964. Accordingly, despite the decision of the Commander Military Sea Transportation Service, Atlantic Area, to grant your claim for sick leave from 6 January through 12 February 1964, your failure to carry out the order of the Placement Officer properly resulted in a charge of unauthorized absence until you reported for examination and medical evaluation of your physical and mental condition. _
_ 4. In view of the above, and in consideration of your past record as cited in the advance notice of proposed removal and restated in the final decision, it is concluded that the charges are sustained and the penalty of removal was appropriate. Accordingly, your appeal is denied.
$ $ $ $
b. This decision exhausts your rights of appeal from your removal.
CoNClusioN oj? Law
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

 In 1960 plaintiff had received a written reprimand and warning against a repetition of Ills Irrational and Impertinent conduct In writing a memorandum to the MSTS Commander for the Atlantic Area concerning the posting aboard ship of a copy of the Civilian Marine Personnel Instructions (CMPI) for the crew’s information (finding 2, infra).

 Kin ding 22, infra.

 Finding 25, infra.

 Finding 28, infra.

 Finding 24, infra.

 Finding 36, infra.

 Finding 18, infra.

 S. Rep. No. 955, 62nd Cong., 2d Sess., p. 21 (1911-12).

 48 Cong. Rec., Part 11, p. 10804 (Aug. 13, 1912).

 Finding 22, infra, Doyle v. United States, 158 Ct Cl. 573, 575 (1962), cert. denied, 374 U.S. 839 (1963), and cases cited therein.

 rinding 24, infra.

 Finding 38, infra.

 Finding 14, infra.